UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOSEPH MIDDAUGH, MARY
MIDDAUGH, and MICHAEL
MIDDAUGH,

        Plaintiffs,                      Case No. 1:13-CV-909

v.                                              HON. GORDON J. QUIST

CITY OF THREE RIVERS,
ERIC PIPER, and NATHAN
GIPSON,

        Defendants.
_____/

**OPINION**

Plaintiffs, Mary and Joseph Middaugh, allege that Defendants, the City of Three Rivers and City of Three Rivers Police Officers Eric Piper (no relation to Plaintiffs' counsel) and Nathan Gipson, are liable for a private individual's theft of their car, a 1992 Buick Roadmaster. Michael Middaugh, Mary and Joseph's nephew, alleges that Officers Piper and Gipson are liable for his personal property that was in Mary and Joseph's car when it was stolen. Plaintiffs have sued the City and Officers Piper and Gipson under 42 U.S.C. § 1983, alleging that the officers violated Plaintiffs' rights under the Fourth, Fifth, and Fourteenth Amendments. Mary and Joseph also allege a state-law trespass claim against Officers Piper and Gipson.[1]

Officers Piper and Gipson have filed a motion for summary judgment on all claims, and the Middaughs have filed a motion for partial summary judgment on their § 1983 claim. The Court heard oral argument on the motions on December 23, 2014, and the matter is now ready for decision.

---

[1] Plaintiffs also alleged a state-law conversion claim, but abandoned that claim as confirmed in their brief and at oral argument.

For the reasons set forth below, the Court will deny the Middaughs' motion. The Court will grant Defendants' motion with regard to the claim against the City and Mary and Joseph's state-law trespass claim, but will deny it with regard to the constitutional claim against Officers Piper and Gipson.

## I. Facts

A 1992 Buick Roadmaster lies at the heart of this case. Joseph's brother Lucky, and Lucky's wife, Chrystal, also feature prominently.

Joseph purchased the Buick in 2010 and sold it to Chrystal's sister in 2011. Lucky and Chrystal later bought the Buick from Chrystal's sister. (Dkt. #35-1 at Page ID#150.) In May 2012, Joseph purchased the Buick from Lucky for $1,000. (*Id.* at Page ID##150–51.) At the time, Lucky could not find his title to the Buick, so he gave Joseph a bill of sale. (*Id.*; Dkt. #37-3.) Joseph did not immediately obtain title to the Buick.

On May 18, 2012, Lucky went to Mary and Joseph's house to attempt to regain possession of the Buick, but he was unable to take it. Officer Piper was called to the residence. Joseph was not home at the time, but while driving home, Joseph spoke to the police dispatcher by phone and stated that he had the bill of sale for the Buick and would show it to Officer Piper when he arrived. Officer Piper and Lucky eventually left before Joseph arrived. A short time later, Lucky drove by Mary and Joseph's house, and Joseph followed Lucky to the Cook Agency, which had placed insurance coverage on the Buick. (Dkt. #35-1 at Page ID##154–55.) Lucky and Joseph got into a physical altercation outside of the Cook Agency, resulting in Officer Piper arresting Joseph. (*Id.* at Page ID##155–56.) At the time of the arrest, Officer Piper was aware that there was a dispute between Lucky and Chrystal, on one hand, and Joseph on the other, regarding ownership of the Buick. (Dkt. #37-12 at Page ID##285–86.) Several weeks later, after making amends, Lucky and Joseph went to the Secretary of State's office, and Joseph applied for a replacement title to the Buick. (Dkt. #35-

1 at Page ID#157.) Joseph subsequently obtained another title listing both Mary and Joseph as the owners of the Buick. (*Id.*)

On April 5, 2013, Chrystal appeared at the Three Rivers Police station with a male friend. Chrystal told Officer Gipson that she was divorcing her husband, Lucky, and that her attorney had told her to get the Buick titled in her name. She also said that her attorney had told her to ask the police to provide security while she obtained the vehicle because there had been problems regarding ownership of the vehicle in the past. (Dkt. #35-2 at Page ID#164.) Chrystal told Officer Gipson that the Buick was at Joseph Middaugh's house, who was her ex-husband's brother, and she showed Officer Gipson an Application for Michigan Vehicle Title that she had obtained earlier that day from the Secretary of State, as well as the keys to the vehicle. (*Id.* at Page ID#165; Dkt. #35-4.) Chrystal requested that the officers accompany her to the Middaughs' house because she was afraid that someone there would try to prevent her from taking the Buick and the situation might become violent. (Dkt. #35-2 at Page ID#166.) Officer Gipson showed the application to Officer Piper. Notably, the section titled "CLAIM FOR TAX EXEMPTION" stated "Given by Spouse," but the seller's name was shown as "Joseph Robert Middaugh and" rather than Lucky Middaugh. (Docket #35-4.) Although Chrystal did not have a title for the vehicle, and without conducting any independent investigation into its ownership, the officers concluded that Chrystal owned the Buick.

Officer Piper drove Chrystal to the Middaughs' residence in his patrol vehicle, while Officer Gipson followed in his patrol vehicle. (Dkt. #35-3 at Page ID#183.) When the officers arrived, they approached the property via an alley near the back driveway of the Middaughs' residence. Although there is a dispute in the testimony about where Officer Piper parked his vehicle, for purposes of the instant motions, Officer Gipson's account that Officer Piper parked between the residence and the Buick will be credited as accurate. (Dkt. #37-9 (Officer Gipson's diagram).) Officer Gipson parked

nearby. After the officers parked, Chrystal exited Officer Piper's patrol car, unlocked the Buick and drove it, along with Michael's personal property inside the Buick, away. Officers Piper and Gipson then drove away, without incident. Although Mary was home at the time and noticed the police cars, she did not attempt to make contact with the police officers, and they did not attempt to make contact with her or anyone else in the residence. (Dkt. #35-5 at Page ID#200.) Chrystal and the officers left the scene before Mary or anyone else inside the residence had a chance to object.

After Chrystal and the officers left, Mary called 911 to report her vehicle having been stolen. Officer Gipson was dispatched to the Middaughs' residence. The Middaughs were upset and tried to show Officer Gipson their title to the Buick, but he told them that he did not need to see it because Chrystal had proof of ownership. (*Id.* at Page ID#203.) Later that day, Mary and Joseph went to the police station and spoke with Detective Sgt. Mike Mohney. Sgt. Mohney asked the Middaughs to bring in their paperwork showing their ownership of the Buick, and he asked Officer Piper to investigate the matter. After reviewing the Middaughs' paperwork and checking with the Secretary of State and the LEIN system, Officers Piper and Gibson concluded that the Middaughs owned the Buick. (Dkt. #37-12 at Page ID#294.) Sgt. Mohney told Officer Piper to do what he could to get the Buick back from Chrystal. (*Id.* at Page ID#292.) Chrystal returned the Buick to the police department about three weeks after the incident. Most of Michael's personal property had been removed, and the Buick was damaged and had mechanical problems.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

4

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

### III.  DISCUSSION

**A.  Constitutional Claims**

The Middaughs allege that Officers Piper and Gipson violated their rights to be free from unreasonable seizures under the Fourth Amendment and not to be deprived of their property without due process of law by assisting or aiding Chrystal in seizing the Buick and Michael's personal property. For purposes of this case, the inquiries under the Fourth and Fourteenth Amendments are the same. *See Anderson v. City of Oak Park*, No. 11-15225, 2014 WL 4415956, at *5 (E.D. Mich. Sept. 8, 2014) ("[W]hen a plaintiff makes a claim pursuant to 42 U.S.C. § 1983 for the repossession of a vehicle, the inquiries based on the Fourth and Fourteenth Amendments are the same.").

Officers Piper and Gipson argue that they are entitled to summary judgment based on qualified immunity. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). A case directly on point is not required for the law to be clearly established. *See Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2083 (2011). However, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* The ultimate question is whether the governmental official had "fair warning" that his conduct violated the plaintiff's constitutional right. *Hope v. Pelzer*, 536 U.S. 730,

5

740, 122 S. Ct. 2508, 2515 (2002). There are two general steps in the qualified immunity analysis. First, "[t]he court must determine whether the 'the facts alleged show the officer's conduct violated a constitutional right.'" *Cass v. City of Dayton*, 770 F.3d 368, 374 (6th Cir. 2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)). If the plaintiff's evidence demonstrates a constitutional injury, the court must then ask "whether that right was 'clearly established.'" *Id.* (quoting *Saucier*). Under *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808 (2009), the court may address either question first. *See McKenna v. Bowling Green State Univ.*, 568 F. App'x 450, 459–60 (6th Cir. 2014).

### 1. Constitutional Violation

In order to establish a violation of a constitutional right under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254–55 (1988). "As a general rule, section 1983 does not . . . prohibit the conduct of private parties acting in their individual capacities." *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 783 (6th Cir. 2007) (internal quotation marks and brackets omitted).

There is no question in this case that Chrystal was a private individual and that Officers Piper and Gipson did not physically participate in seizing the Buick.[2] The issue, then, is whether the conduct of Officers Piper and Gibson suffices to establish state action. *See Hensley v. Gassman*, 693 F.3d 681, 688–89 (6th Cir. 2012). Governmental actors

---

[2] There is no question that Plaintiffs' interests in the Buick and the personal property inside the Buick were protected by the Fourth amendment, *see Cochran v. Gilliam*, 656 F.3d 300, 307 (6th Cir. 2011) (noting that "[t]here is no argument that Cochran has a constitutional right to the personal property he keeps in his leased residence" and citing *Soldal v. Cook County*, 506 U.S. 56, 69, 13 S. Ct. 538, 547 (1992)), or that Chrystal's taking of the Buick and the personal property constituted a "seizure" under the Fourth Amendment. *See Pepper v. Village of Oak Park*, 430 F.3d 805, 809 (7th Cir. 2005) ("The interference which Pepper incurred—the permanent taking of her television and the substantial damage to her couch, while each was secured in her residence—likewise amounts to a 'seizure' under the Fourth Amendment.").

6

> normally can be held responsible for a private decision only when [they have] exercised coercive power or [have] provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment.

*Blum v. Yaretsky*, 457 U.S. 991, 1004-05, 102 S. Ct. 2777, 2786 (1982). The question of state action is "necessarily [a] fact-bound inquiry." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S. Ct. 2744, 2755 (1982).

Although this case does not involve a repossession—Chrystal did not claim to have a security interest in the Buick and, thus, state law did not authorize Chrystal to take the Buick if she could do so without breaching the peace, *see* M.C.L. § 440.9609(2)—repossession cases and closely-related eviction cases provide an appropriate framework for deciding the state action issue in this case. "When a police officer is involved in a private party's repossession of property, there is no state action if the officer merely keeps the peace, but there is state action if the officer affirmatively intervenes to aid the repossessor enough that the repossession would not have occurred without the officer's help." *Moore v. Carpenter*, 404 F.3d 1043, 1046 (8th Cir. 2005); *Mitchell v. Gieda*, 215 F. App'x 163, 165 (3d Cir. 2007) ("[A]n officer's presence at the scene of, and acquiescence in, a private repossession is not state action unless accompanied by affirmative intervention, aid, intimidation, or other use of power which converts him from a neutral third party to, in effect, an assistant of the repossessing party.").

Recognizing the highly-factual nature of repossession cases, courts have described police involvement in such cases as falling along a spectrum, ranging from absence of all involvement, at one end, to affirmative intervention, aid or intimidation at the other. *See Barrett v. Harwood*, 189 F.3d 297, 302 (2d Cir. 1999). According to the *Barrett* court, "[a]t one end of the spectrum is *de*

7

*minimis* police involvement not amounting to state action in aid of repossession. . . . Further along the spectrum we find involvement greater than mere presence, yet still insufficient to constitute state action in aid of repossession." *Id.* (citation omitted). Cases falling at the other end of the spectrum involve police officers taking a more active role in the repossession, where police involvement has become more critical to the success of the repossession. Courts in such cases "have found state action or ruled that the issue at least survived a motion for summary judgment." *Id.* The Eighth Circuit has identified a non-exhaustive list of factors that courts have considered in determining whether a police officer's actions assisted or aided a private party's repossession:

> [W]hether the officer accompanied the private party onto the scene, told the debtor that the seizure was legal, ordered the debtor to stop interfering or he would go to jail, intervened at more than one step in the repossession process, failed to depart before the repossession has been completed, stood in close proximity to the creditor, and unreasonably recognized the documentation of one party over the other.

*Price-Cornelison v. Brooks*, 524 F.3d 1103, 1117 (10th Cir. 2008) (citing *Marcus v. McCollum*, 394 F.3d 813, 818 (10th Cir. 2004) (collecting cases)).

The Sixth Circuit's decision in *United States v. Coleman*, 628 F.2d 961 (6th Cir. 1980), is representative of cases falling on the *de minimis* end of the spectrum. In *Coleman*, the repossessor asked the police to park nearby the site of a repossession of a pickup truck in case trouble arose. The police followed the repossessor from the police station and "parked down the street and around the corner from [the defendant's] residence." *Id.* at 963. The repossessor took the truck without incident, and the police remained in their car the entire time. In determining whether the repossession involved state action, the court noted that the relevant inquiry was whether "there are sufficient indicia of official involvement so as to convert the repossession into state action." *Id.* at 964. The court observed that "where state involvement in private action constitutes no more than acquiescence or tacit approval, the private action is not transformed into state action even if the

8

private party would not have acted without the authorization of state law." *Id.*  The court concluded that the officers' involvement fell "far short of compulsion . . . [because they] neither encouraged nor directed [the repossessor] to repossess the truck in a particular manner [and] [t]heir presence at the scene was not an indispensible (sic) prerequisite for repossession of the truck." *Id.*

*Soldal v. County of Cook*, 942 F.2d 1073 (7th Cir. 1991) (en banc), *rev'd on other grounds*, 506 U.S. 56, 113 S. Ct. 538 (1992), is an example of a case falling at the other end of the spectrum. In *Soldal*, the owner of a trailer park requested that deputy sheriffs stand by to keep the peace during an illegal eviction of the plaintiff from the park.  A deputy sheriff accompanied two employees of the trailer park to the plaintiff's trailer, and stood by while the employees disconnected the utilities from the trailer and hooked it to a tractor.  The deputy told the plaintiff that he was there to prevent the plaintiff from interfering with the eviction.  *Id.* at 1074.  The court found that the deputies' presence at the scene and comment to the plaintiff sufficed to establish state action because the deputies prevented the plaintiff from exercising his right to forcibly resist the unlawful eviction.[3] *Id.* at 1075; *see also Abbott v. Latshaw*, 164 F.3d 141, 147 (3d Cir. 1998) (holding that the plaintiff's evidence that the defendant officer advised one party that she had a right to immediate possession of the vehicle, ignored the plaintiff's attorney's protests of the seizure of the vehicle, and threatened to arrest the plaintiff's attorney if he did not move his car to allow the other party to remove the vehicle).

*Hensley v. Gassman*, 693 F.3d 681 (6th Cir. 2012), involved an even more compelling case for a finding of state action.  In *Hensley,* the defendant deputies arrived at the debtor's residence at the same time as the repossessor, ordered one of the plaintiffs to move in order to allow the repossessor to hook up the vehicle, ignored the plaintiffs' demands to leave the property, told the

---

[3] The plaintiff in *Soldal* alleged a conspiracy between the trailer park and the deputies.  *See* 942 F.2d at 1075. Plaintiffs do not allege a conspiracy in this case.

9

plaintiffs that the repossessor was taking the vehicle, and ignored a plaintiff's protests and explanation, confirming that the vehicle was going to be taken. *Id.* at 691. In addition, the defendants ordered the repossessor to tow the hooked-up vehicle to the road and then smashed the vehicle's window and ordered the plaintiff from the vehicle. *Id.* at 691–92. The Sixth Circuit concluded that the defendants' conduct enabled the repossessor to seize the vehicle by resolving the stalemate in favor of the repossessor. *Id.* at 692.

Officers Piper and Gipson contend that their conduct was merely that of disinterested peacekeepers at the scene of a repossession, along the lines of the police officers' involvement in *Coleman*. The Middaughs see things differently, arguing that "[t]his case is even more obvious than *Hensley*." (Dkt. # 37 at Page ID#241.) Both parties miss the mark, but Plaintiffs do so by a wider margin.

The instant case differs substantially from *Hensley* because Officers Piper and Gipson did not interact with the Middaughs or anyone acting on their behalf and, thus, no confrontation occurred. Consequently, Officers Piper and Gipson did not tell the Middaughs that the seizure was lawful (at least before it occurred), that Chrystal was taking the vehicle, or that they would be arrested if they interfered, nor did they refuse to listen to the Middaughs' side or unreasonably recognize Chrystal's documentation over the Middaughs' documentation because none was presented to them, and they did not smash the Buick's window and order any Plaintiff from the Buick. *See also Price-Cornelison*, 524 F.3d at 1117. The Middaughs' reliance on *Booker v. City of Atlanta*, 776 F.2d 272 (11th cir. 1985) (per curiam), is similarly misplaced. In *Booker* the Eleventh Circuit concluded that summary judgment was not warranted because a jury could find that although the officer did not actively assist with the repossession, his "arrival with the repossessor gave the repossession the cachet of legality and had the effect of intimidating [the plaintiff] into not

10

exercising his right to resist, thus facilitating the repossession." *Id.* at 274.  In contrast, there is no record evidence in this case suggesting that Officers Piper's and Gibson's presence intimidated the Middaughs into not objecting to the seizure, likely because although Mary saw the officers, she did not see Chrystal and thus did not realize what was transpiring until Chrystal and the officers drove away.

On the other hand, this case differs from *Coleman* because Officers Piper and Gibson did more than merely follow Chrystal to the Middaughs' house and park down the street while Chrystal took the Buick.  Instead, after reviewing Chrystal's paperwork and concluding that Chrystal owned the Buick, Officer Piper drove Chrystal to the Middaughs' residence, with Officer Gipson following them.  Officer Piper drove onto the Middaughs' property and parked between the Buick and the residence, while Officer Gipson parked close by.  Officer Piper and Chrystal both got out of the patrol vehicle, and Chrystal unlocked the Buick, started it, and drove it away.  Officer Piper then returned to his vehicle, and he and Officer Gipson drove away.

In light of the foregoing, the Court concludes that the Middaughs have presented sufficient evidence to permit a reasonable jury to conclude that Officers Piper and Gipson provided affirmative aid or assistance that was critical to Chrystal's taking of the Buick.  Although Officers Piper and Gibson did not interact with the Middaughs or intimidate them into not objecting, state action can occur even when the plaintiff is absent from the scene, so long as the police officer's conduct affirmatively aided the repossession.  *See Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 191 (3d Cir. 2005) (stating that "what was ultimately important was whether the injury to the plaintiff was aided by the use of state-derived authority, not whether the alleged state action was immediately directed at the plaintiff").  Moreover, the Middaughs' evidence provides a more compelling basis for state action than cases such as *Coleman*, where police officers play a detached role in the seizure.

11

In one such case, *Moore v. Carpenter*, 404 F.3d 1043 (8th Cir. 2005), the court concluded that the officers were not so involved that the repossession would not have occurred but for their assistance:

> The officers were not asked to accompany [the repossessor] to ensure the repossession went smoothly and they did not arrive with him. Instead, they were summoned to a scene not of their making only to resolve a breach of the peace that was in progress. Before the officers arrived, [the repossessor] had gained access to the boat and was already in the process of repossessing it. The officers did not tell the Moores the repossession was legal or that they would be arrested if they interfered.

*Id.* at 1046 (citations omitted). In contrast, the Middaughs' evidence shows that after concluding that Chrystal was entitled to the Buick, Officers Piper and Gipson drove her to the Middaughs' residence, where Officer Piper parked his vehicle to provide Chrystal easy and quick access to the Buick in order to avoid a confrontation with the Middaughs. Given these facts, a jury could reasonably conclude that Officers Piper and Gibson joined forces with Chrystal and that their participation was instrumental in Chrystal's seizure of the Buick. In fact, Mary testified that because of the way the officers' cars were parked, she could only see the patrol cars and could not see anyone getting into the Buick. (Dkt. # 35-5 at Page ID##198–99.) Thus, in the sports vernacular, Officers Piper and Gipson arguably set a "screen" to hide and protect Chrystal. Absent such assistance from the officers, it is unlikely that Chrystal would have taken the Buick. While Officers Piper and Gibson insist that they accompanied Chrystal to the scene only to "keep the peace," a reasonable jury could conclude otherwise from Officer Gipson's post-seizure statement to the Middaughs that "the effing car didn't belong to [them]." (Dkt. #37-13 at Page ID#313.)

The next issue is whether the seizure was reasonable. The proper standard is "whether the officers' actions [were] objectively reasonable in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872 (1989). Officers Piper and Gipson argue that they acted reasonably because they were entitled to rely on the Application for

Title that Chrystal showed them as conclusive evidence that she owned the vehicle. In support of this argument, they cite the following statute:

> Upon the delivery of a motor vehicle and the transfer, sale, or assignment of the title or interest in a motor vehicle by a person, including a dealer, the effective date of the transfer of title or interest in the vehicle is the date of signature on either the application for title or the assignment of the certificate of title by the purchaser, transferee, or assignee.

M.C.L. § 257.233(9). They further contend that *Perry v. Golling Chrysler Plymouth Jeep, Inc.*, 477 Mich. 62, 729 N.W.2d 500 (2007), which interpreted a similar version of this statute, supports their argument.

Neither the statute nor *Perry* helps the officers. The statute expressly requires "delivery of a motor vehicle," which the officers knew had not occurred, and *Perry* is inapposite. In *Perry*, the issue was at what point the buyer obtained title to a vehicle that was involved in an accident. The plaintiff sued the seller, arguing that the seller was still the owner of the vehicle because, although the application for title had been signed, the title was not effectively transferred because the application had not been delivered to the Secretary of State. *Id.* at 64, 729 N.W.2d at 501. Construing M.C.L. § 257.233, the Michigan Supreme Court held that the title was transferred when the application for title was signed. *Id.* at 66-67, 729 N.W.2d at 503. Officers Piper and Gipson argue that *Perry* establishes that an application for title is conclusive proof of ownership. However, in *Perry*, unlike in this case, the seller had delivered the vehicle to the buyer, so the condition of delivery necessary to trigger the statute was met. Moreover, nothing in *Perry* suggests that an application for title carries the weight of a court order.

Even assuming that Chrystal's Application for Title constituted proof of ownership, there are ample facts from which a jury could conclude that Officers Piper and Gipson acted unreasonably. First, the officers knew that the matter was a civil matter—Chrystal did not report

13

the Buick as stolen. Second, the officers knew that the Middaughs disputed Chrystal's ownership of the vehicle—Chrystal told them so, and the Middaughs had possession of the Buick. Officer Piper was also familiar with the history of the disputed ownership of the Buick—he had arrested Joseph less than a year earlier after Joseph and Lucky had a physical alteration regarding ownership of the Buick. Third, because Chrystal never claimed that she was repossessing the Buick as, or on behalf of, a creditor, the officers had no reason to believe that Chrystal was legally entitled to use self help to obtain the Buick from the Middaughs. More importantly, Chrystal did not have a court order awarding her possession of the Buick—a fact that would render a showing that the officers acted unreasonably "a laborious task indeed." *Soldal v. Cook Cnty.*, 506 U.S. 56, 71, 113 S. Ct. 538, 549 (1992). Finally, the Application for Title and Chrystal's story suggested that something was amiss. In one section the application said that Chrystal's spouse had given her the Buick and in another section it said that Joseph was the seller, but the officers knew that Joseph was not Chrystal's husband. Facts such as these call for a judicial resolution, not a "curbside courtroom." *Abbott*, 164 F.3d at 149. "[L]aw enforcement officers are not the appropriate arbiters of [such] disputed interests." *Dixon v. Lowery*, 302 F.3d 857, 866 (8th Cir. 2002). Accordingly, a question of fact remains whether Officers Piper and Gipson acted unreasonably.

### 2. Clearly Established Law

"When evaluating the plaintiff's case against qualified immunity, this Court considers whether the facts alleged, viewed in the light most favorable to the plaintiff, establish that the defendants' conduct violated a 'clearly established' constitutional right 'to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful.'" *Margeson v. White Cnty.*, 579 F. App'x 466, 470 (6th Cir. 2014) (quoting *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011)). The contours of the right allegedly violated must be

14

"sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987); *see also Saucier*, 533 U.S. at 202. In other words, the unlawfulness of the officer's conduct must be apparent "in the light of pre-existing law." *Id.* "[T]here need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (quoting *Hope*, 536 U.S. at 741, 122 S. Ct. 2508).

It was clearly established at the time of the incident in question, in April of 2012, that when a state actor "directs, supports, and encourages . . . private parties to take specific action, that is state action." *Blum*, 457 U.S. at 1028, 102 S. Ct. 2777. In addition, the Sixth Circuit "has long recognized that individuals have a clearly established right not to have property in which [they] enjoy[] a lawful possessory interest seized by state action in violation of the constitution." *Hensley*, 693 F.3d at 694. As noted, this was not a situation in which Officers Piper and Gibson were called to the scene of a repossession already in progress in order to diffuse a potentially volatile situation, or arrived at the scene separately to observe the situation from a distance. Rather, Officers Piper and Gibson were intimately involved in Chrystal's seizure from beginning to end, and the evidence is such that a reasonable jury could conclude that their goal was to ensure that Chrystal obtained the Buick. Therefore, it would have been apparent to any reasonable police officer at the time of the incident in question that aiding or assisting Chrystal in the seizure was unlawful. Accordingly, Officers Piper and Gipson are not entitled to qualified immunity.

### 3. Municipal Liability

The Middaughs sued the City under § 1983, alleging a claim of municipal liability under *Monell v. New York Department of Social Services*, 436 U.S. 574, 106 S. Ct. 2505 (1986). However,

15

they do not oppose dismissal of their claim against the City and have not attempted to demonstrate that a policy, practice or custom caused their alleged injuries. Accordingly, the claim against the City will be dismissed.

**B.    State Law Claims**

Officers Piper and Gipson contend that they are entitled to governmental immunity on Mary and Joseph's state-law trespass. The Court agrees.

A governmental employee may establish a right to immunity on an intentional tort by showing: (1) that his acts were undertaken during the course of employment and he was acting, or reasonably believed he was acting, within the scope of his employment; (2) he performed the challenged acts in good faith or without malice; and (3) the acts were discretionary, as opposed to ministerial. *Odom v. Wayne Cnty.*, 482 Mich. 459, 480, 760 N.W.2d 217, 228 (2008). Only the second element is at issue. "Good faith" is a subjective test, under which a defendant is subject to liability only if he acted with "malicious intent." *Id.* at 482, 760 N.W.2d at 229.

Mary and Joseph contend that they have shown malice based on the officers' deliberate decision not to get their version of the story before allowing Chrystal to take the Buick. Mary and Joseph also argue that Officer Piper acted with malice because he tends to pursue "young, petite 20-something women for sexual purposes on the job." These arguments lack merit. The officers' failure to obtain the Middaughs' version relating to ownership of the Buick does not demonstrate that they acted with malicious intent. Moreover, there is no evidence that Officer Piper was pursuing Chrystal for sexual purposes through his conduct, and even if he were, such evidence would not show a malicious intent. Accordingly, Officers Piper and Gipson are entitled to summary judgment on Mary and Joseph's trespass claim.

### IV. Conclusion

Because the Court concludes that genuine issues of material fact remain with regard to the Middaughs' constitutional claims against Officers Piper and Gipson and that Officers' Piper and Gipson are not entitled to qualified immunity, the Court will deny the Middaughs' motion for partial summary judgment and will deny Officers Piper and Gipson's motion for summary judgment on the constitutional claim. The Court will grant Officers Piper and Gipson summary judgment on Mary and Joseph's trespass claim and grant the City summary judgment on the municipal liability claim. Finally, Mary and Joseph's abandoned conversion claim will be dismissed.

An Order consistent with this Opinion will enter.


Dated: February 6, 2015              /s/ Gordon J. Quist            
                                    GORDON J. QUIST
                                    UNITED STATES DISTRICT JUDGE